Illinois versus Vicky Pappas. And for the appellant, we have Ms. Obar, and for the appellee, Ms. Shepard. You may proceed, counsel. I know it's late in the day, and I know we're the last one you've got to listen to, but I submit that you will not hear a more important case. You'll have to speak up a bit. I submit you will not hear a more important case today, because this case involves a child, and this case involves the custody of a child. I submit that there is nothing that judges do that is more important. I'm here today on behalf of Svetlana. I am representing Vicky Pappas, but the reality of it is I'm here because I am truly concerned about what has occurred in terms of her being removed from the care of her grandmother and how that was done. Now, I have filed a brief, and that brief sets out four really major arguments. The number one is whether or not my client, Vicky Pappas, received appropriate notice of whether or not the child was going to be removed from her care. I then go on to question whether or not what the court did that day was act in the child's best interest in removing that minor child from the care of her grandmother. Shortly thereafter, we filed a petition to intervene that was denied, and I believe that the court erred in denying that petition to intervene. My final argument is whether or not the court should have conducted a hearing into the issues that it believed were of concern to the court. Let me first talk about the notice. The facts are set forth, and I'm just going to very briefly, I know that you all have read those facts. Grace, she goes by Svetlana Grace, and she was called Grace by her family. Grace had been in the care of her paternal grandmother since she was 10 weeks old. She was born in January of 2013, and she was removed from her grandmother's care in July of 2016. Her grandmother is the only home she had known. The child was three and a half years old at the time of removal and had spent all of that time, with the exception of the first 10 weeks of life, with her grandmother. There is no question, and my brief sets it out, and I reference the record repeatedly. Every single report that was filed with the court, be that some sort of status report, be that any sort of document in terms of visitation plans, family service plans, permanency reports, every single report said the same thing, that Grace was happy. She was well established at her grandmother's home. She felt secure that when she was there, she was meeting or exceeding all developmental milestones. She was blossoming in the care of her grandmother. There was never a question about the child doing very well in her grandmother's care. So, in terms of the best interest of the child, I believe the statute goes through a series of factors, and I can go through those in terms of every single one of the statutory factors favor that child being kept with her grandmother. Now, in my fact situation, I go through some of the difficulties that the trial judge and my client, Vicki Pappas, had. And it arose out of this issue with a CASA, and a CASA is an individual who is appointed to walk through and assist the court. The CASA worker was appointed very, very, very late in the process. And if you look at the record, and if you look at what the trial judge indicated, the trial judge indicated the CASA worker was appointed to find out whether or not biological mom and biological dad were still having a relationship. Because they were denying they were having a relationship, but pretty much everybody had concerns that they continued on in their relationship, and that was a portion of the termination of their parental rights, as to whether or not they continued to have a relationship with one another. So, the CASA volunteer was appointed for that purpose. My client, Vicki Pappas, met with the CASA volunteer. She went to the child's school with the CASA volunteer. She simply said, I don't want the CASA volunteer in my home. Now, this really doesn't have anything to do with terminating the placement of the minor child, except it explains, it explains why the trial judge took the steps it took. And I think if you understand that, and this was done a long time before the CASA volunteer was water under the bridge, there were no problems, and then they had determined the mother, the biological mother's rights were terminated. The biological father surrendered his rights with a specific placement for adoption, and that specific placement for adoption was with Vicki Pappas. So, with regard to that, his parental rights were never terminated, except for the adoption with Vicki Pappas. So, that kind of gives you the background. This child was awarded the court throughout all of this? Correct. And I understand that the court has the right to place, but the court is still bound statutorily. And I know this court is well aware that the only right that a court has to act is based on statute. So, we really do have to look at the statute here in terms of what the court did and why the court did it. And I want to bring up a couple of things, and that is the purposes. If you look at the Juvenile Court Act and what those purposes are, the number one purpose is to secure for each minor the care and guidance as will serve the safety and moral, emotional, mental, and physical welfare of the child. And there's no question that with a child three and a half years old who has bonded, and everyone agrees they had bonded with the grandmother, to remove the child at that point was simply not in the child's best interest. Well, here's my problem with all of this. Yes, sir. The child is awarded the court. Correct. The court directed that your client cooperate with CASA? Correct. She did. Well, but you won't allow CASA in my home? What's that all about? Quite frankly, Your Honor, this had continued for, and the court can look at how long this has continued, and there's no question. She allowed social workers into her home up to every other week. So every two weeks the social worker was in her home. If you look at the record, and I cite to the record, the state's attorney had been in her home. Counsel. Okay. The court-appointed special advocate has essentially allowed the court to look into the situation and report back. Correct. And this is the home where the child is living, and the custodian is your client. Yes. Who won't let the court-appointed special advocate into her home. Right. So I'm the trial judge. What am I supposed to make of it? Well, the trial judge actually just, to be brutally honest with you, that was over. And, in fact, the social worker indicated that came up in 2015. I cite to it because, number one, it's in the record, and, number two, I think it explains why a year later, a year later, when we're at a different process completely, it comes back up. And so I think that that's important. Had the judge said at that time, you let Casa in or this is a problem, but the trial judge didn't say that, I'm simply giving that to you to give this court an understanding, a broader understanding, how we got to a situation where the trial judge and my client were kind of adverse to one another. And, as a result, my client quit appearing at the hearings. She told the social worker. It's in the social worker report. It's in the record. She said, I know I upset the trial judge. I don't even know what I'm doing to upset the trial judge, but I'll just quit coming. Because it seems like every time I show up, the trial judge gets angry with me, so I'm going to quit coming. That's what the social worker said. So in terms of her not appearing, she did not appear at a July 7th of 2016 hearing. The Casa issue had happened approximately in 2015. So the issue then came back up and the judge was like, oh, well, you know, I'm upset about that. But the Casa worker specifically, I mean, just to tighten that up a little bit, was appointed for the sole purpose of determining whether or not biological mom and biological dad were still in a relationship. My client had social workers, the state's attorney, numerous people in and out of her home, and to be brutally honest, it was just one more person. And her thought was, well, it's one more person. Her thought also was she was not a trained social worker. It was a volunteer, not a trained social worker. So any of that matters how? It matters only to the extent that it explains why my client and the trial judge were at odds with one another. No, it explains nothing. I'm the trial court. Here's this court-appointed special advocate, a person appointed by the court, looking to this matter concerning a board of the court. There is no appropriate response from the custodian saying, you're not coming in my house. But it's not acceptable. And, you know, when you say it explains it, no, it doesn't explain it. Had the trial judge, okay, had the trial judge said this is the issue at that time, then, Justice, I believe that you might be correct. But the trial judge did not. The trial judge said, well, I'm kind of frustrated about that, but we're going to keep the placement at that time. So his mistake was cutting your client slack instead of saying, what's this all about? I'm going to pull the kid out now. No, sir, that's not what I said. Well, I don't understand what this is all about. What this is all about, and I'm going to bring you back to what this is all about. Okay, go ahead. This is about Grace. This is about a child who was three-and-a-half years old who because of a little skirmish between a trial judge and the board. No, counsel, no. I was the juvenile court judge for 12 years in Champaign County. I had all kinds of different agencies acting on my behalf. And when we're dealing with wards of the court, I want to hear about skirmishes from custodians, okay? The court's in charge. The court has to look out after wards. The court sent this person out to check on whatever this person wanted to do, and that's it. I don't understand what you're talking about, a skirmish between CASA worker and the court. There's no skirmish. There's no authority your client had. What's that issue here? And that issue ended in November of 2014. I mean, let's go through this. That issue about the CASA volunteer ended in 2014 in the early part of January of 2015. Then we have a best interest hearing. At that best interest hearing, it doesn't come up again. The judge moves to the best interest hearing. There is significant testimony about the best interest of Grace. The parental rights are terminated. Biological father signs paperwork saying, I'm going to allow the adoption by grandmother. And so that ends it at that point in January of 2015 at that best interest hearing. And I would submit to you, Your Honor, that there was uncontradicted evidence at that hearing. And you say, you are a juvenile court judge. When is there a situation where it's absolutely uncontradicted? Where actually if you look at the hearing on the best interest, the state's attorney stood up and talked about the best interest of the child being with Vicki Pappas. Repeatedly. Bruce Iwick was the state's attorney. He repeatedly talked about this being the child's best interest. Counsel, why didn't she adopt the child between January 2015 and July 7th of 2016 when the child was removed? In terms of that, it is true. They had paperwork. The paperwork could not get started until June. And that is in there. June of what year? 2015. I think it's June 23rd of 2015. They said, we're finally at a position where we can put the paperwork together. This is DCFS. Then DCFS started putting that paperwork together. And so she had to wait on them to do that portion of it. But ultimately, didn't she dismiss her petition for adoption? Yes, but let me finish the timing part. She did. Well, okay. I don't want you to run out of time because we know the timing. Yes, sir. Yes, ma'am. With regard to dismissing, she dismissed it. But attached to the motion to dismiss was a request that it be refiled in Peoria County where she could do it in front of a different judge, signed by an attorney. And the day of that hearing, on July 7th, she had an attorney who showed up. The attorney was Julia Davis. She showed up. She was talking to the judge. She had no idea that this was – I don't believe Julia Davis had any idea that this is what had happened. Judge Bernardi, excuse me, Don Bernardi, the guardian ad litem, did not have an opportunity to be there in the morning. They agreed to continue the case. Julia Davis leaves. So, yes, it was dismissed, but it was dismissed with an intent to refile in Peoria County. That documentation was presented to the judge. Let me ask you this. Did the judge have a reasonable basis to be concerned as to whether or not your client was ultimately going to provide permanency for this child? No. And I will tell you why. Because on July 5th, there is a permanency report that is filed by the social worker. That social worker indicates, I have no concerns. No longer. Correct. There were concerns, and the caseworker says, I think that's cleared up now. I'm not concerned. Correct. But, of course, the judge didn't have to adopt that view based on whatever information he or she receives. I believe that that was filed on July 5th, and the hearing was held on July 7th. I think the judge had read the prior order. I'm not certain what he had done with the report that was filed July 5th. But, additionally, in Volume 20, that is that July 7th hearing, and that social worker also testifies at length. And when she testifies in that volume, she talks on and on about this is the best interest, the bonding. Are there any concerns? There are no concerns. She is asked by the guardian ad litem. She is asked by the state's attorney. She is asked by the court itself. Hadn't your client asked for the child to be removed from her home shortly before that hearing? She had. She had. And I want to go back to that portion of the act that talks about, because I think it's very important, the portion of the act that talks about that the juvenile court act is to be administered in the spirit of humane concern, not only for the rights of the parties, but also for the fears and limits of understanding of all who appear before the court. And, yes, is it easy for the four or five of us to sit around and say, wow, she should have figured this out. Wow. But I think that she had true concerns and true fears. She was afraid of the judge. She was afraid of what was going to happen. And she, in that fear, was afraid. And the social worker actually said her fear was that she was not moving fast enough. And as a result, it was just like, I don't want to be told. I don't want to have to give this child up, so I'll do it. And then I believe the social worker spoke with her, and then that was resolved. Is there any question, though, that Judge Fitzgerald was going to sign the decree of adoption at one point in time? I mean, he was interested in having the grandmother adopt the child, wasn't he? I think from her point of view, she did have a very real concern, both that there would be concerns about the adoption, the struggles that they had had in the past. I think from her point of view, her fears and her limits of understanding, which is what we have to consider, which the three of you have to consider as well, is that she was truly concerned as to what was going to happen. That was number one. Number two, and she told the social worker, I just want it to be a happy occasion. I want the adoption to be a happy occasion. So she said, I won't do the adoption in front of this judge. If I have to do the adoption in front of this judge, I'll give my grandchild up. No. I disagree with that, Justice, and I'll tell you why. I don't believe that that is what her rationale was. I think she was afraid the child was going to be removed, but then she said, not that she wasn't going to do it in front of the judge, but I think the social worker suggested, just refile it in another county. Just refile it in another county. Now, between the five of us, why Julia Davis didn't file a motion for a change of venue from Judge Fitzgerald, I don't know, but she didn't, and the bottom line is, my client was very concerned about appearing in front of Judge Fitzgerald and what was going to occur. And quite frankly, the fear that it would be denied was probably much worse than wanting to concede. And so that fear of just take her because having her taken from me is too painful, I think that's what I think you guys are missing in terms of, and I think that's what Judge Fitzgerald has. So does the record contain any support for the claim that it was a social worker who told her to dismiss the case here and move it to Peoria County and refile? I believe her testimony on July 7th in Volume 20 does state that. I also believe that her report filed July 5th also reports that she, I don't know if it says she suggested it, but she definitely makes the comment that it is in the child's best interest that the adoption occur in Peoria County. So the social worker definitely put it in writing in her July 5th report, and I believe it is also in that her testimony of July 7th, which is Volume 20. Why would the social worker think that would be in the best interest? Because I think the social worker truly, truly was concerned for Grace and truly thought that this child... Well, why is it in the best interest of the child if she's formally adopted by court order in Peoria or Springfield? Why does it matter? Or rather Bloomington? In Bloomington? Because I think of the concerns and the fears of Ms. Pappas, and so I think those concerns she was trying to address those in terms of having the concerns. Here's what I don't understand. Hadn't Judge Fitzgerald already decided it was in the child's best interest to live with the foster mother? Yes. Back when they did the termination? Correct, on July, excuse me, in January of 2016, that is correct. And what's the connection to Peoria? None, to my knowledge. So, I mean, here's another thing. Judge Fitzgerald's absolutely familiar with the circumstances, the fact that this child's lived with the grandmother for three or three and a half years. The judge in Peoria's not going to know anything, and that judge is going to wonder, what are you doing here in Peoria? Well, but I think it's just the adoption, to be brutally honest, the adoption was... We all know the adoption was going to go forward, whether it was in Peoria or in McLean County, but again, I don't know that that fear or concern of my client was satiated. As a trial judge, it's been a year and a half since the termination, right? And the adoption has not concluded. Correct, but again, and I started to go into that and then answered the next question about the dismissal with the refiling in Peoria County, but it does, there was an issue where she had taken the cell phone away and there was an investigation of her teenage son. DCFS then put everything on hold, and they finally, they finalized the paperwork October 3rd or 7th, I don't recall, and then within two months she had signed all the paperwork for the adoption. The paperwork adoption had been signed by December of 2014. So why is there a delay until July or whenever the next time is? Why didn't that adoption get processed from December until then? She asked for one continuance. She had asked for a continuance on the adoption because she was trying to get a different judge to hear it, because she was concerned about Judge Fitzgerald. And I understand that, and I understand that you shake your head, and I just... But the bottom line is, again, what we're talking about is Grace and someone who is not familiar with the legal process in terms of... But she had an attorney. No, she had an attorney for the adoption. She did not have an attorney that represented her in the juvenile case. Right, but the attorney, isn't she advising her to go ahead with the adoption in McLean County? I think she, I'll be brutally honest, she shows up, it shows up in the transcript, she shows up, is this okay, Judge, everybody's happy, nobody's raising any questions about it? Look at the transcript of that day. Julia Davis walks in assuming, I'll just dismiss it, refile it in McLean County. Nobody raises any issues with her when she does that. She leaves for the day. Then they have a hearing on the juvenile component of it. But she appears in front of the judge, and that is also in the transcript. There's no question. Judge Fitzgerald doesn't say, what are you doing? Why are we doing this? Why are we dismissing this? He signs the dismissal. So, yeah. But then does that give him pause that the adoption's not going to go through? The document itself seeking the dismissal references the refiling and attaches a signed petition to be refiled in Peoria County. So it's not as if it's hanging out there and nobody knows what's going to happen next. The motion to dismiss in McLean County specifically references and attaches the Peoria County documents. So, I'm way out of time, so I appreciate it. Late in the day, no questions. Thank you. Ms. Shepard. May it please the Court. I was going to talk about jurisdiction, but since Your Honors didn't. No, we still want you to. Your counsel has rebuttal, so you can address it then. Okay. Well, there are two avenues on which this Court could find that did have jurisdiction. Neither one of those is effective. Basically, this Court would have jurisdiction to consider the July 7th order barring placement, which is what this case is really about, only if it were a step in the procedural progression to a later order which this Court has jurisdiction to review. And the State's argument is that this Court has jurisdiction to review any order, including that July 7th order, because denial of intervention is not appealable under Rule 306A-5, which does not apply because a denial of intervention is a final order. And Rule 306A-5 allows for appeals from interlocutory orders. That rule also, other components of that rule, it has to be an order affecting a minor's care and custody. If the appeal is not otherwise specifically provided for elsewhere in the Supreme Court rules, and it's a final order, it's not interlocutory. And as we argued in our brief, it's Rule 304B that applies, not A, contrary to opposing counsel's argument, we did not argue that. And also, I would note, we didn't say it in our brief, but I would also note that the denial of petition for intervention also did not directly affect the minor's care and custody. So, but the main thing is it's an interlocutory, it's the rule applies to interlocutory orders, this was not interlocutory. Now there was another, there's a notice of appeal that Ms. Papp has filed in the Circuit Court. That's ineffective because it says that the order appealed from is the September 22nd, 2016 order denying her motion to reconsider, quote, the court's trial order of July 7th, 2016 and August 3rd, 2016. Now there was no such order, there was no such motion for reconsideration, so that notice of appeal is totally ineffective to give this court jurisdiction over to review any order, certainly not the July 7th order. So, as the court is well aware, jurisdiction is not something that can be weighed, it can't be agreed that, well, we're going to look at this anyway, no matter how important the underlying issues may be, this court needs to have jurisdiction. And this, there is no jurisdiction. So now, are you saying that this was not an interlocutory appeal request? Is that what you're saying? I'm saying that it was an appeal of a final order in a case that still had other matters pending. So in that sense, you could say it was making a distinction between an interlocutory appeal and an interlocutory order. So in the sense that the case was still ongoing, the appeal is interlocutory, but Rule 606.A.5 says that it provides for appeal from interlocutory orders and denial of intervention, many cases have held, including this court in SG, that denial of intervention is final order. So that means, what, you have to file a 303 notice of appeal within 30 days? In this case, Your Honor, it would be Rule 304.B, because 304.B would apply, because it's a case involving multiple parties or claims, and also it's a case involving a guardianship or similar proceeding, which finally determines the right or status of a party. So that's 304? 304.B, not 304.A. Now, they did ask for a 304.A. finding, though, correct? They did, and the trial court denied that. It doesn't affect. But if she filed a 304.B notice of appeal, wouldn't you be here arguing she wasn't a party? Isn't that the argument that the judge even used? She's not a party, therefore I don't have to allow her to intervene or something along those lines, because I already took the kid away. Yes, and we didn't make that argument because there are cases that recognize that there's that kind of gray area, if you're trying to intervene and what is your status. They talk more about stand-ins. So, you know, we didn't go so far as to say she's not a party, but that's true. I mean, and this order obviously affected her right to participate, and so even though she's not technically a party, it would be hard-pressed to say that she didn't have a right to, just on that basis, that she didn't have, she was not technically a party, that she would not be able to participate further. But if she had received the 304.A. finding, then wouldn't she be able to appeal the denial of the motion to intervene? Technically, well, theoretically, but she didn't do that. I know it was denied, but... Right, she didn't do that, and she did file a notice of interlocutory appeal, which, in the circuit court, and so that would have been good under 304.B if she had actually put an order that had been entered in that notice. But I'm saying if the trial court had granted the 304.A. finding, wouldn't that be sufficient to allow her to appeal the motion, the denial of the motion to intervene? It should be, yes. But you're saying that was a final order. Well, 304, whether it's under A or B, does apply to final orders. It's not the finding that makes it final, as Your Honors know. That makes it appealable, but the fact that you put in that 304.A. finding only makes it appealable right now. Yeah, so under either A or B, yes, she would have been able to, but she didn't pursue that. What happened instead? Petition to reconsider something? Was that it? I'm sorry, Your Honor? Where did the steps fail that she should have done here to give us jurisdiction? She should have, in her rule 304.B, well, in her notice of interlocutory appeal in the trial court, she should have specified that the order that she was appealing was the September 22, 2016, order denying her motion to reconsider the denial of intervention. Instead, she said, I'm appealing that September 22 order denying reconsideration of the orders of July 7 and August 3. And there is no such order. So if she had put the actual order that was at issue in that notice, then this court would have jurisdiction. And of course, Your Honors are aware of, construe the notice of appeal liberally, give the state notice, and we cited Smith, very similar situation, I think it was a Supreme Court case. And in that case, the Supreme, well, I think it was the Supreme Court, the court said that the notice of appeal not only failed to mention the order that the party wanted to appeal, it specifically mentioned a different judgment, and only that judgment. And that's not good enough. It's not, that does not, that's not sufficient to vest the court with jurisdiction. We have the same thing here, I would say a step further, in that the order that is mentioned in the notice is one that was never made. Smith was from this court? I believe it was Supreme Court. Let me just open my brief real quick here. Let's see. No, that's Supreme Court 2008. So I would move on, I guess, to, of course, our argument is that you don't have jurisdiction to consider any of the arguments that Ms. Mattis makes. If you'd like me to talk about the propriety of the order barring placement, I could talk about that. What about notice with respect to that? Notice. The order of May 12th, I think it was, specifically stated that foster parent is ordered to appear at the July 7, 2016 hearing. If foster parent fails to appear, the court may bar placement of a minor. Was she in court that day? She did not appear in court. After July 2015, it was at that hearing, and contrary to opposing counsel's representation, the court did continually bring up the concern about the CASA. And in one of those hearings in July 2015, the whole year before this order issue was made, the court and the GAL and the prosecutor kind of put their heads together and said, you know, she's refusing to let the CASA in. What do we do about this? So they said, well, we'll talk to her. They talked to her out of, well, away from the court recorder. And as the GAL said when he came back, she said that if I have to have the CASA in my home, I'll give up custody. So she didn't appear in court after that. So did the trial judge tell the circuit clerk to send her notice of the July 7 hearing? The order that she appeared? The May 2016 order that set up her hearing on July 7, 2016, saying basically, if you don't show up, I'm taking the kid out of the home, or I may take the child out of the home. Did the court direct the circuit clerk to send her a notice? Your Honor, I frankly can't remember that from the record. What we relied on was she can't argue any lack of notice because she concedes that she doesn't agree. Yeah, the caseworker came out and handed me that order. And in fact, her argument on appeal is, well, the caseworker didn't really tell me how important it was that I should show up at this hearing. And of course, the order said that she needed to show up at the hearing. She was ordered to appear. And not only that, that if she didn't appear, then the court might bar placement. And in fact, the record shows also that she was aware as early as, let's get it, the July 2015 hearing. There was discussion about her refusal to allow the passenger in her home and possibly barring placement due to her lack of cooperation. So that was something that came up back in July 2015 and the entire year before. But there was a date set, which was July 7th of 2016. And what I'm getting at is apparently the judge relied on the caseworker to give her the notice. Is that appropriate under the Juvenile Court Act when she is the foster parent who's had this trial for three and a half years? Is that a proper way to give notice? She's entitled to notice under the statute. Right. Yes. I would assume that it's notice from the court. I'm not prepared to say that the court didn't direct that notice be given. Again, we relied on there's no argument that she could make that she didn't have notice because she got the order. I mean, I'm not – if she has notice of this order, if the court had said, yes, I direct that she be given notice of the order, I don't see how that would be better than her concession that, yes, the caseworker handed me this order. She had actual notice of it because she had it in her possession. And apparently even the caseworker discussed the order with her because she's saying, well, the caseworker didn't make it clear enough that this was really what the court meant And she also – it shows that – the record also shows she knew about this because a week before the hearing, the July 7th hearing where placement was – after which placement was barred, she told the caseworker and her supervisor that she was concerned that the court might bar placement at the hearing. So she was aware of this all along and was aware also of the continuing problem with the CASA because the trial court kept bringing this up. And so she clearly did have notice, both of the order and what it said. So as far as whether it was in the – the trial court erred in entering its order barring placement, standard is whether that order is abuse of discretion or against manifest weight, and there's ample evidence supporting that order in the record. And the CASA issue is important, as Your Honor is discussing, but it's also important in that as early as, again, that July 15th – July 15th hearing, she said, hey, if you make me have the CASA come into my house, I'll just give up placement of grace. She was willing to give that up instead of – Was that communicated to the court? Yes, it was. It was the GAL who came back into the courtroom after the GAL and the prosecutor had a discussion with her and said this is what she said. Was that Bernardi? Yes. Yes, Your Honor. She also repeatedly delayed and eventually dismissed the adoption proceedings. She canceled the adoption hearing a week before it was supposed to occur, and then it was only until three months later that she finally kind of talked to the caseworker about why she might have done that, and she agreed that she may be having second thoughts on finalizing the adoption. And as to whose idea it was to file in Peoria County, the record shows that she was talking to the caseworker about this. She discussed with the caseworker that she wanted to file the adoption in Peoria County, and supposedly it was because she didn't like the trial judge and the GAL, and the caseworker said, why can't you just participate in this short hearing? It's only going to be 15 to 30 minutes. And she told the caseworker, quote, she would not adopt if she had to adopt in McLean County. What was the last part? She would not adopt if she had to adopt in McLean County. That's what the caseworker said that she said. So it is the matter of the best interest of SP. It's not appropriate, as your honors are well aware, to focus on sensibilities, no matter what the act says. The sensibilities of Ms. Pappas are important, but we have to look at SP's need for permanency, and this went on for close to a year and a half, and they weren't any closer, as of the July 7, 2016 hearing where termination was barred, to having her adopted because the adoption petition had been dismissed. There was no indication that would be filed in Peoria County, and it should have happened, it could have happened, as the trial court said, months and months ago. So the court had ample grounds for finding that there was, for its concerns. If we were to agree with you that we have no jurisdiction to dismiss this appeal, then what? Where is this case, and what's going on with this child? What I recall from the record, the last news in the record was that she had been placed with another foster family, which is very important, given her young age and need for permanence. When did that happen? When did that happen? Since it wasn't really an issue, I don't remember exactly. Sometime last summer or spring? I'm trying to remember how far the record went. It wasn't an issue, so frankly I don't remember. Okay. Thank you, Your Honor. Thank you. Any rebuttal, Ms. O'Leary? Yes. I appreciate the time you guys are spending on this, but let's talk about that notice. And counsel has indicated the notice that we filed, the notice of interlocutory appeal, is insufficient. I disagree. I mean, I think it specifically talks about, Vicki Pappas respectfully requests the appellate court reverse or vacate the trial court's orders enter July 7th, August 3rd, and September 22nd, and to allow Vicki Pappas to intervene. So they're all listed separately. What counsel is talking about in the paragraph above, it indicates, hereby appeals the appellate court's September 22nd, 2016 order denying petitioner's motion to reconsider. And I actually think there's a typo, it should say, and the court's orders of July 7th and August. But the way it reads, I see what she's saying. I never understood the argument until just this minute. But I do think that this notice of interlocutory appeal does indicate that we are appealing those orders. And I think when you look at it. I want to talk briefly about the Smith case, because it is a Supreme Court case. The Smith case, it doesn't even mention the order. I mean, it doesn't even mention the court order of February of 2006 in the Smith case. It just talks about it appealed one order, but the other orders aren't even mentioned. At least in our notice of interlocutory appeal, it certainly puts individuals on notice as to what we are appealing. What was the date of the denial of the motion to intervene? The motion of the denial of the motion to intervene, I believe, was in August. But then we filed a motion to reconsider, and that was denied September 22nd of 2016. We filed the notice on October 6th, and I don't know when the actual petition for leave for appeal and supporting legal memorandum was filed in this court, but that was also done. A petition for leave to appeal, to take an interlocutory appeal under 306. But counsel, don't you have to file your petition to appeal within 30 days of the denial, and it's not told by the filing of a motion to reconsider? I think it is told by a motion to reconsider, because I believe the court was intending. I think a motion to reconsider does hold that, but our petition for leave to appeal was filed, I believe, October 3rd in this court. And with regard to that, that does set forth in detail everything that we were hoping to obtain from the court. I would also note, and I think it's in my record, we never had access to this record until after the motion for interlocutory appeal was granted. We asked for the court to at least give us access to the record so that we could prepare, and that was denied as well. So we didn't have that. I would note that, in addition, the Smith case, I don't think it's on point, because the notice of appeal did not even mention the court order. Our notice of appeal does. I would also cite, there's a case, and I believe it was cited by counsel, People v. Anna Lynn D., In re Desiree O., which talks again about that notice of appeal. That is a first district case, but it talks about, you know, if your notice of appeal, you have to give it a broad, construed liberally and read liberally. And then the only other thing I was going to reference was, so I do think, the other thing is I do think the notice of appeal, excuse me, the petition for interlocutory appeal, it's as if we met a higher standard. You know, if we're 304A, we throw in a notice of appeal and we don't have to jump through this. This was served on everyone, this petition for leave to appeal on an interlocutory appeal. So in terms of setting out everything that was being appealed and putting them on notice, because the idea is, does this put you on notice of what is being dealt with? To a certain extent, the idea that we did, the argument is that this was a final order as to my client, and therefore an interlocutory appeal was not necessary. I would submit that an interlocutory appeal goes beyond what is necessary on a simple appeal and actually gives more indication and more information. Certainly our notice of appeal that was filed in the circuit court gives this, gives the opposing party notice of what was being appealed. What rule are you filing it under? I filed under 306. I treated this as an interlocutory appeal. Because there's a piece that says that the motion to reconsider the court's ruling under 306 does not extend the time in which to appeal. I beg your pardon? The motion to reconsider the court's ruling does not extend the time to which to appeal for 306. I honestly believed it was a 304 issue, and when the judge denied the 304, that's the position we took. Well, that's why I just asked you what the number was, and you just told me 306. I appealed under 306 because I was denied under 304A. Okay, thank you. Thank you, counsel. We'll take this matter under advisement and be in recess.